1

          UNITED STATES DISTRICT COURT
2           SOUTHERN DISTRICT OF FLORIDA
           CASE NO:15-20615-CIV-O'SULLIVAN
3     _____

4     YENISEY PEREZ, CINTIA CINI,
      and all others similarly
5     situated under 29 USC 216 (B),

6
                      Plaintiffs,
7
                      -vs-
8
      ANASTASIA M. GARCIA, P.A.
9     ANASTASIA M. GARCIA,

10

11                    Defendants.
      _____\
12

13

14    AT:           300 71 Street
                    Suite 605
15                  Miami Beach, Florida 33141
                    May 11, 2016
16                  10:10 a.m.

17

18            DEPOSITION OF PAUL GARCIA

19

20         Taken before Rochel Albert, CSR and Notary

21    Public in and for the State of Florida at Large,

22    pursuant to Notice of Taking Deposition filed in the

23    above cause.

24

25     DEPO EXPRESS REPORTING, INC. (305) 305-3333

```
 1    APPEARANCES:

 2        RIVKAH JAFF, Esq.
          LAW OFFICES OF J.H. ZIDELL
 3        300 71st Street, Suite 605
          Miami Beach, Florida  33141
 4        Attorney for plaintiffs

 5

 6        SAMANTHA MICHELLE FRAGA, Esq.
          (via teleconference)
 7        LAW OFFICES OF EDDY O. MARBAN
          1600 Ponce De Leon Boulevard, Suite 902
 8        Miami, Florida 33134-3991
          Attorney for Defendants

 9

10

11    Also present:  YENISEY PEREZ & CINTIA CINI

12                       I N D E X

13    WITNESS                 EXAMINATION  BY      PAGE

14    PAUL GARCIA          MS. JAFF  ............  3

15

16    EXHIBITS FOR IDENTIFICATION               PAGE
      None offered.

17

18

19

20

21

22

23

24

25
```

```
1                          PAUL GARCIA,
2                 being first duly sworn by the court
3                 reporter, testified as follows:
4                          EXAMINATION
5    BY MS. JAFF:
6         Q    Can you please state your name for the
7    record.
8         A    Paul A Garcia.
9         Q    Your date of birth, sir.
10        A    ████████
11        Q    Your address, sir?
12        A    Which one?
13        Q    Your primary residence.
14        A    ████████████ ████ ██████████████
15   ███████
16   █    ████████████████████
17   █    █████████
18   █    ██████████████
19   █    ████████████████████████
20   ██████████
21        Q    And are you currently employed?
22        A    Yes.
23        Q    What are you currently employed as?
24        A    Self-employed.
25        Q    As what?
```

```
 1      A    Forensic CPA.
 2      Q    And do you have your own firm, sir?
 3      A    I do.
 4      Q    What is that called?
 5      A    Paul A. Garcia, P.A.
 6      Q    Are you a CPA yourself?
 7      A    I am.
 8      Q    How long have you been self-employed at
 9   Paul A. Garcia, P.A.?
10      A    Since 1985.
11      Q    Do you work with anyone there?
12      A    Of course.
13      Q    Who do you work with there?
14      A    I have a staff.
15      Q    Okay.  How many people work with you?
16      A    Do you want their names?
17      Q    I would like you to tell me how many
18   people.
19      A    Okay.  Six.
20      Q    And now I would like their names.
21      A    Maria Garcia, Iliana Larcada.
22      Q    Can you spell that last name?
23      A    L-A-R-C-A-D-A.
24      Q    Uh-huh.
25      A    Yvette Delpino.
```

```
 1        Q     Spell the last name.

 2        A     D-E-L-P-I-N-O.  Eric Neuhoff.

 3        Q     Spell the last name, please.

 4        A     N-E-U-H-O-F-F.

 5        Q     And anybody else?

 6        A     Yes.  How many is that?

 7        Q     Four.

 8        A     Rudy Ambruster.

 9        Q     Can you spell the last name?

10        A     You can spell that just like I can.  I

11   don't know.  A-M-B-R-U-S-T-E-R.

12        Q     First name is Udi?

13        A     Rudy.

14        Q     Okay.  One more person.

15        A     Maria Benetis I believe is her name.

16        Q     And were all these six people working with

17   you during the year 2014 and '15?

18        A     Iliana was.

19        Q     That is Ilaina Dacarda, I think you said?

20        A     Larcarda.  I believe Eric too.

21        Q     When did Yvette come on board?

22        A     I don't know.

23        Q     Was it before 2014 or after?

24        A     Probably after.

25        Q     After 2015 or before 2015?
```

```
 1        A     Before.

 2        Q     And Rudy, do you remember when he came on

 3   board?

 4        A     2015.

 5        Q     Maria Benetis, do you recall when she came

 6   on board?

 7        A     2016.

 8        Q     And I believe Maria Garcia is your wife,

 9   correct?

10        A     She is.

11        Q     Has she been with the firm since 1995

12   since you opened?

13        A     No.

14        Q     When did Maria come on board?

15        A     Approximately 1990.

16        Q     Is Ms. Garcia also a CPA?

17        A     No, she is not.

18        Q     In what capacity does she work for you?

19        A     She is my office manager, she is an

20   accountant.

21        Q     Out of those six people, who is your

22   secretary?

23        A     She is.

24        Q     Is that Ms. Garcia?

25        A     Yes.
```

1     Q    Out of those six people, are there any

2  others that are CPAs?

3     A    Eric Neuhoff.

4     Q    Can you tell me a little bit about your

5  clientele?

6     A    I have been in practice 35 years.  I have

7  a boutique tax practice.  And I am one of the top

8  forensics in town.  There's only like five of us.

9     Q    Do you cater to commercial operations,

10  personal operations?  What kinds of clients do you

11  cater to?

12     A    High net worth individuals.

13     Q    Do you deal with attorneys on a day-to-day

14  basis?

15     A    Every day of my life.

16     Q    Is that your clientele, attorneys?

17     A    In my forensic practice, yes.

18     Q    Can you tell me about your forensic

19  practice?

20     A    I am an expert in the family law arena.

21     Q    What do you mean by that?

22     A    I act as a forensic accountant in family

23  law cases.

24     Q    To your knowledge approximately how many

25  family law attorneys did you have as your

```
1     clientele in the year 2015?
2        A    A lot.
3        Q    More than 100?
4        A    Less than 100.
5        Q    More than 50?
6        A    Yes.
7        Q    Somewhere between 50 and 100?
8        A    That's correct.
9        Q    In 2013 would it be the same number?
10       A    Same number.
11       Q    And in 2014 would it be the same number?
12       A    Same number.
13       Q    In 2015 would it be the same number?
14       A    Same number.
15       Q    Through until the present today would it
16    be around the same amount of people?
17       A    Same number.
18       Q    Do you know who Anastasia Garcia is?
19       A    Yes.
20       Q    And how do you know her?
21       A    She is one of my referring attorneys.
22       Q    How long have you known Ms. Garcia?
23       A    Fifteen years.
24       Q    How did you first meet?
25       A    I met her because she was sharing space
```

```
 1    with an attorney that I also work with.
 2         Q    What is the name of that attorney?
 3         A    Raquel Rodriguez.
 4         Q    Does Ms. Garcia still share space with
 5    her?
 6         A    No.
 7         Q    Is Ms. Rodriguez still one of your
 8    clients?
 9         A    She is.
10         Q    Did you know her for a period of time
11    before you knew Ms. Garcia?
12         A    Yes.
13         Q    For how long?
14         A    I have known Raquel ever since I became a
15    forensic accountant 22 years ago.  She and I did
16    my first case together.
17         Q    And Ms. Rodriguez introduced to you Ms.
18    Garcia; is that correct?
19         A    Yes.
20         Q    Fifteen years ago, correct?
21         A    Approximately.
22         Q    What has your relationship been with
23    Anastasia Garcia?
24         A    Three fold.
25         Q    Can you explain that?
```

```
1        A     Professional.

2        Q     Uh-huh.

3        A     I have also advised her in accounting and

4    tax matters.

5        Q     You advised her or she advised you?

6        A     I don't think she would advise a CPA.  I

7    advise her.

8        Q     Okay.  There's no need to be rude.  I am

9    just asking questions.

10       A     I am not being rude.  I am answering your

11   questions.  Why would you say that I am rude?  I

12   haven't been rude.  I have been answering all your

13   questions, ma'am.

14       Q     I appreciate that.  You know her in a

15   professional capacity, and you know her as her

16   advisor, that you advise her in tax issues?

17       A     Yes.

18       Q     And how else do you know her?

19       A     She is a personal friend.

20       Q     You advise her about tax issues related to

21   her work or related to her personal life?

22       A     I don't understand that question.

23       Q     All right.  How do you advise her in tax

24   issues?

25       A     Whenever she has a tax question, I would
```

```
 1    advise her and give her my opinion.

 2        Q     Is that related to her professional or

 3    personal life?

 4        A     Both.

 5        Q     Do you do Ms. Garcia's taxes for her?

 6        A     I do not.

 7        Q     You do not?

 8        A     I do not.

 9        Q     Tell me a little bit about your personal

10    relationship with Ms. Garcia.

11        A     She is a friends.

12        Q     Do you go on vacations together?

13        A     I have.

14        Q     How often do you go on vacations with Ms.

15    Garcia?

16        A     I have been twice.

17        Q     Do you recall what years that was?

18        A     No, I don't.

19        Q     Do you have barbecues with her often?

20        A     I don't.

21        Q     Do you have dinners with her?

22        A     I do.

23        Q     How often do you have dinners with Ms.

24    Garcia?

25        A     I couldn't tell you.  It varies.
```

```
1        Q    Once a month, twice a month?

2        A    Maybe.

3        Q    Does Ms. Garcia come to your house?

4        A    Sometimes.

5        Q    Is she friends with your wife?

6        A    Yes, she is.

7        Q    Do they get together and have girls' night

8   out on a regular basis?

9        A    Not between themselves.  Possibly in a

10  group.

11       Q    And how often do they do that?

12       A    You have to ask my wife.  She is the

13  *bolster.

14       Q    I am asking you.

15       A    I don't know.

16       Q    Okay.  You can just say that.

17       A    I will.

18       Q    Do you have children, Mr. Garcia?

19       A    Yes, I do.

20       Q    Are any of your children divorced?

21       A    No.

22       Q    Has Ms. Garcia ever represented any of

23  your children in any matters that are domestic?

24       A    No.

25       Q    Has Ms. Garcia ever represented you in any
```

1   capacity?

2       A    Never.

3       Q    Has she ever represented your wife in any

4   capacity?

5       A    Never.

6       Q    You also said that you know Ms. Garcia on

7   a professional level.  How is it different than

8   you advising her?

9       A    I work for her.  She hires me.

10      Q    You have a written contract with Ms.

11  Garcia?

12      A    No.  Every time there's a case, there's a

13  engagement letter to her firm in order to

14  *perceive the client privilege in the divorce

15  matter.  So we have many engagement letters

16  throughout my business relationships with her.

17      Q    Has there ever been a time period in

18  between the 15 years where you have stopped your

19  professional relationship with Ms. Garcia?

20      A    No.

21      Q    And has there ever been a time in those 15

22  years that you have stopped your personal

23  relationship with Ms. Garcia?

24      A    No.

25      Q    Would you consider Ms. Garcia to be a

1    friend of yours?

2        A    I think I already said that.

3        Q    Is that a yes or no?

4        A    Yes.

5        Q    A close friend of yours?

6        A    Yes.

7        Q    Have you ever been to Ms. Garcia's house?

8        A    Yes.

9        Q    And how often do you do that?

10       A    Whenever it presents itself.

11       Q    Would you say often?

12       A    No.

13       Q    When you deal with Ms. Garcia on a

14   professional capacity, is that primarily over the

15   phone?

16       A    Yes.

17       Q    Does she come to your office and meet with

18   you often?

19       A    Yes.

20       Q    How often does she meet with you?

21       A    Depending on the case.  Depending on the

22   issues of the case.  Depending on what she wants

23   to talk to me about.

24       Q    Do you go and visit Mrs. Garcia on a

25   regular occasion?

```
 1        A      Rarely.

 2        Q      Is that how it's been over the past 15

 3   years?

 4        A      Yes.

 5        Q      Why do you rarely go to her when she comes

 6   to you often?

 7        A      I am the one providing the service to come

 8   to me.

 9        Q      Does Ms. Garcia pay you an hourly rate?

10        A      Ms. Garcia doesn't pay me.  The client

11   does.

12        Q      Does the client pay you an hourly rate?

13        A      That's correct.

14        Q      Do you have your own contract or agreement

15   with the client?

16        A      In the engagement letter the client

17   getting divorce is responsible for my fee.  Ms.

18   Garcia's firm is only used to preserve the

19   privilege.

20        Q      Do you know who Jenny Perez is?

21        A      Yes.

22        Q      Who was she?

23        A      She was Ms. Garcia's office manager.

24        Q      Have you met Ms. Perez before today?

25        A      Yes.
```

```
1        Q     And how long have you known Ms. Perez?

2        A     Dealing with Ms. Garcia's office.

3        Q     So for the entire 15 years that you have

4    been dealing with Ms. Garcia's office you have

5    known Ms. Perez?

6        A     I have known Ms. Perez ever since she

7    started working with Ms. Garcia until their

8    departure.

9        Q     Do you know when that first started?

10       A     I don't know.

11       Q     Do you know approximately how many years

12   that was?

13       A     I don't know.

14       Q     What is yours relationship with Ms. Perez?

15       A     Strictly business.

16       Q     When you dealt with Ms. Perez, how often

17   would that be?

18       A     Rarely.

19       Q     When you did deal with Ms. Perez, what

20   would you be dealing with her about?

21       A     Scheduling matter.

22       Q     Anything else?

23       A     A document.

24       Q     Anything else?

25       A     Not really.
```

1       Q       Have you ever dealt with Ms. Perez on a

2       personal level?

3       A       Rarely.

4       Q       Have you ever done any professional work

5       for Ms. Perez?

6       A       No.

7       Q       Have you ever represented her in any

8       capacity?

9       A       No.

10      Q       When you did deal with Ms. Perez, was she

11      always professional?

12      A       Yes.

13      Q       Did she strike you as an honest person?

14      A       Yes.

15      Q       Did she strike you as someone with

16      integrity?

17      A       I didn't know her enough to answer that

18      question.  So it's a big word.

19      Q       Fair enough.  Did you know if Ms. Perez

20      and Ms. Perez and Ms. Garcia had a good working

21      relationship?

22              MS. FRAGA:  Object to form.

23      A       I believe they did.

24      Q       And what makes you believe that?

25      A       I saw good working relationship every time

```
 1     I went to her office on the rare occasions that I

 2     did go.

 3        Q    Do you know if Ms. Perez was fired or if

 4     she quit?

 5             MS. FRAGA:  Object to form.

 6        A    I don't know.

 7        Q    When did you first hear that Ms. Perez is

 8     no longer employed by Ms. Garcia?

 9        A    I don't remember.

10        Q    When did you first hear about the instant

11     lawsuit that you are here on?

12        A    I don't remember.

13        Q    How did you hear about the lawsuit that

14     you are here today on?

15        A    I don't remember.

16        Q    Did you speak with Ms. Garcia about this

17     lawsuit?

18        A    Specifically I don't remember if I spoke

19     to her about it.  I speak to Ms. Garcia a lot.

20        Q    And the lawsuit has never come up in

21     conversation?

22        A    Of course.

23        Q    And what have you discussed about the

24     lawsuit?

25             MS. FRAGA:  I object to the extent that
```

```
1    any of communications are covered by the
2    accountant-client privilege.
3              MS. JAFF:  There's no such thing in
4    federal court.  Okay.
5         Q    You can answer that question.
6         A    If I am covered by the accounting-client
7    privilege, then I am not going to answer anything
8    related to any advice that I have given Ms. Garcia
9    related to any overtime issues, any method of
10   payment or any retaliation conversations that I
11   have had with her.
12             MS. JAFF:  I am going to certify that
13   question then.
14        Q    I am going to ask you about your
15   conversations with Ms. Garcia, can you tell me
16   about your conversations with Ms. Garcia regarding
17   the lawsuit?
18        A    There's a lawsuit going on.
19        Q    What do you know about the lawsuit?
20        A    It's a retaliation and overtime claim.
21        Q    How do you know that?
22        A    I read.
23        Q    What do you mean by that?
24        A    There's a lawsuit filed, right?
25        Q    Yes.
```

```
 1      A    There's a document.

 2      Q    Correct.

 3      A    I read it.

 4      Q    You have gone up on the docket and looked

 5   it up?

 6      A    I have read it.

 7      Q    Have you gone on the docket and pulled the

 8   documents yourself?

 9      A    I have not.

10      Q    You have been provided with the document?

11      A    Yes.

12      Q    By who have you been provided with the

13   document?

14      A    A friend.

15      Q    Who is that friend?

16      A    Bill Pierson.

17      Q    Who is he?

18      A    He is an attorney.

19      Q    Is he a family law attorney?

20      A    No, he is not.

21      Q    What kind of attorney is he?

22      A    Criminal one.

23      Q    Why did he give you filing from this

24   lawsuit?

25      A    I asked him to.
```

```
 1        Q     For what reason?

 2        A     I wanted to read it myself.

 3        Q     For what reason?

 4        A     I wanted to read it myself.  No particular

 5   reason.

 6        Q     When did you first ask Mr. Pierson for the

 7   pleading in this case?

 8        A     I don't remember.

 9        Q     Was it this year or last year?

10        A     I don't remember.  Probably last year.

11   This year.

12        Q     You think 2015?

13        A     Yes.

14        Q     What documents have you read in this

15   particular lawsuit?

16        A     The initial complaint, I believe.

17        Q     Any other documents?

18        A     No.

19        Q     What was your thoughts after you read the

20   complaint?

21        A     I didn't have any thoughts.  I just read

22   the complaint.

23        Q     Did you call Ms. Garcia after you read the

24   complaint?

25        A     I don't remember.
```

```
1      Q    Did you discuss the complaint after you
2   read it with Ms. Garcia?
3      A    I don't remember any specifics about me
4   discussing anything with Ms. Garcia about the
5   lawsuit after I read it.
6      Q    Did it change your opinion of Ms. Perez
7   after you read the initial complaint?
8      A    I was shocked.
9      Q    And why were you shocked?
10     A    I didn't think that she being a manager
11  that she would have any claims for overtime.
12     Q    What do you mean by being a manager she
13  wouldn't have any claims?
14     A    She was a manager.  She was salary
15  employee just like my staff.  It's my
16  understanding that you can't claim any overtime.
17     Q    Did you have any other thoughts other than
18  that about Ms. Perez?
19     A    No.
20     Q    Did it change your opinion of Ms. Perez?
21     A    I was just shocked that she would do
22  something like that.
23     Q    What do you mean by like that?
24     A    I was shocked.  I thought she had a good
25  working relationship with Anastasia and I thought
```

```
 1   she was happy.  She never told me she was unhappy.
 2   I saw good working environment.  Anastasia seemed
 3   to get along with her, treated her like a sister
 4   like a daughter, had a good working and personal
 5   relationship with her.  She seemed happy.
 6       Q    If Ms. Perez had an issue would she have
 7   complained to you if she was unhappy working for
 8   Ms. Garcia?
 9            MS. FRAGA:  Object to form.
10       A    I think she had enough of a relationship
11   with me she knew that I was close to Anastasia.
12   So if she was unhappy, if she felt in any way,
13   shape or form mistreated in any way, I think Jenny
14   would have come to me.
15       Q    Did Ms. Perez text you or e-mail you or a
16   regular basis?
17       A    She e-mailed me.
18       Q    Was it always in a professional capacity?
19       A    Yes, I believe so.
20       Q    Always regarding scheduling and documented
21   as you had mentioned before?
22       A    She may have copied me.  Her direct
23   contact in the office wasn't me.  But she may copy
24   me on e-mails and things of that nature.
25       Q    Who would have been the direct contact of
```

1    Ms. Perez?

2       A    My wife.

3       Q    Since you read the complaint, that means

4    that you also read the count for retaliation; is

5    that correct?

6       A    I know there's a count for retaliation.  I

7    don't remember specifics.  I read the complaint

8    once.  I haven't looked at it again.

9       Q    After Ms. Perez filed the complaint, do

10   you know what Ms. Garcia's reaction was?

11      A    I don't.

12      Q    Do you know if the working relationship

13   between Ms. Perez and Ms. Garcia changed after she

14   filed the lawsuit?

15      A    I don't know that.

16      Q    Do you know who Ms. Cini, Yesenia Cini is?

17      A    Yes.

18      Q    How do you know who she is?

19      A    She was an office clerk at Ms. Garcia's

20   office.

21      Q    And what was your dealings with her?

22      A    None.

23      Q    You had absolutely nothing to do with her

24   while she was working for Ms. Garcia?

25      A    Zero.

```
 1        Q     You never received and email or text
 2   message from her?
 3        A     Personally no.
 4        Q     Did she ever communicate with your wife?
 5        A     Possibly.
 6        Q     Was your wife a direct contact for
 7   Ms. Cini as well?
 8        A     Probably.
 9        Q     Do you know what her working relationship
10   with Ms. Garcia was?
11        A     No.
12        Q     And you had no personal relationship with
13   Ms. Cini, correct?
14        A     Zero.
15        Q     When you saw that Ms. Cini had filed the
16   lawsuit, what did you think?
17        A     I didn't have any opinions.
18        Q     Do you know if Ms. Cini quit or was fired?
19        A     I have no idea.
20        Q     Did Ms. Perez ever help out on any
21   after-work events?
22              MS. FRAGA:  Object to form.
23        A     I don't know what you are talking about.
24   Please explain.  I don't understand your question.
25        Q     Sure.  You said that you knew Ms. Perez in
```

```
 1    a professional capacity associated with Ms.

 2    Garcia's firm.

 3        A    Yes.

 4        Q    Did Ms. Perez ever attend any events that

 5    were after work that were associated with Ms.

 6    Garcia's firm?

 7             MS. FRAGA:  Object to form.

 8        A    Events?  I am still not grasping your

 9    question.  Can you tell me what kind of events?

10        Q    Did the Family and Children Services ever

11    have any after-work events or dinners or galas?

12        A    You are talking about an organize called

13    Kid Science.  Is that the child and family court

14    services that you are referring to?

15        Q    Yes, sir.

16        A    Yes.  So Jenny helped in the capacity of

17    registering people in the event.  And she got

18    compensated for that.

19        Q    Do you know how much she was compensated

20    for that?

21        A    I don't remember.

22        Q    And do you know what years she did that?

23        A    I think she did it twice, I believe, maybe

24    three times.

25        Q    What is your involvement in Kids Side?
```

```
 1        A    I was the president of the organization.

 2        Q    For what years?

 3        A    I am off the board in year.  We are in

 4   '16.  I was the president for '14, '13 and '12.

 5        Q    And not '15?

 6        A    Fifteen.  I was the -- I was a board

 7   member.  I was the obviously the export.

 8        Q    Can you tell me what a little bit Kid Side

 9   is?

10        A    I would be glad it's a great organization.

11   We provide funding to family court services so

12   that family court services can perform tasks such

13   as counseling, parental supervision and visits by

14   parents, psychological testing of children in

15   distress because of divorce that have zero to no

16   means to pay for these services outside of the

17   protection of family court services, so we have

18   the kids well-being as a focus, and we provide

19   funding vis-a-vis fund-raising events, outright

20   donations.  And that is what we stand for.  That

21   is the goal of the organization.

22        Q    How did Ms. Perez come to be involved as I

23   think you said helping with registering at the

24   events?

25        A    We asked her.
```

1      Q      And we as you?

2      A      I don't think I asked her.  I think

3  anesthesia offered her.  With you one again we

4  paid her for those services that were not in kind.

5      Q      Was Ms. Garcia also working at the event?

6      A      Working?  She wasn't working at the event.

7  She was attending the gala.

8      Q      Is she a part of the board?

9      A      Yes, she is.

10     Q      What is her capacity?

11     A      She was the president before me.  We are

12 not off the board.  But obviously we are export

13 members and still very active members in the

14 organization, I promote it just like I did this

15 morning.

16     Q      When Ms. Perez helped out with the

17 registration at the Kid Side was she professional?

18     A      Yes.

19     Q      Was she always honest?

20     A      Honest?  There was no reason to be honest.

21 She was checking in people.  I don't understand

22 your question.

23     Q      She wasn't taking any money?

24     A      She was.

25     Q      Was she honest with the money?

```
 1        A    To my knowledge, yes.

 2        Q    She wasn't taking any money?

 3        A    To my knowledge, no.

 4        Q    Was there ever any accusations that she

 5   had stolen money?

 6        A    To my knowledge, no.

 7        Q    Was your opinion of her as a hard worker?

 8        A    Hard worker?  I think she was a worker.

 9   She was a good worker.

10        Q    Did she complain?

11        A    Not to me.

12        Q    Did you hear her complain to others?

13        A    I don't know.  I wasn't in her office

14   24/7.  I had my own office.  If she did, I

15   wouldn't know.

16        Q    Did Ms. Cini help out at the Kids Side at

17   all?

18        A    I don't know.  Maybe she did one year.

19   But I don't remember frankly to be honest with

20   you.

21        Q    Did you so any e-mails from Ms. Garcia

22   complaining about Ms. Perez while she was employed

23   by Ms. Garcia?

24        A    I don't remember.

25        Q    Did you ever receive any e-mails from Ms.
```

```
 1    Garcia about Ms. Cini complaining about her work?

 2        A    I don't remember.

 3        Q    If you were to review her e-mails would

 4    that be able to refresh your recollection?

 5        A    I could, but I received hundreds of

 6    e-mails from Ms. Garcia.  I would venture to say

 7    thousands between my 15 years ago and today.

 8        Q    When Ms. Perez was employed by Ms. Garcia,

 9    did you receive any e-mails to the effect that Ms.

10    Perez was acting insubordinate?

11        A    I don't remember.  But if there was and

12    you have one in order to refresh my recollection

13    you can show it to me.

14        Q    I don't have one.  I am just asking.  Do

15    you recall receiving any e-mails from Ms. Garcia

16    about Ms. Cini acting insubordinate while she was

17    employed?

18        A    I don't remember.

19        Q    Can you tell me what your thoughts are

20    with regards to Ms. Garcia and her working

21    environment?

22        A    I thought it's a good working environment

23    Ms. Garcia is a very kind, very smart, very good

24    attorney.  I believe she creates a good working

25    environment.  I have never seen anything other
```

```
 1   than that upon my visits ever to her office.

 2        Q    Does Ms. Garcia swear a lot, curse?

 3        A    I wouldn't say a lot.

 4        Q    Do her e-mails contain a lot of swear

 5   words or curse words?

 6        A    I don't think so.  Again, if you have one,

 7   please provide it to me and I can refresh my

 8   recollection.  I can opine.  Just show it to me.

 9        Q    What would you say that you speak to Ms.

10   Garcia on a daily basis?

11        A    I wouldn't say on daily basis.

12        Q    On weekly basis?

13        A    I have cases with her, so yes, we talk

14   professionally maybe weekly.  I don't know.

15   Depends.

16        Q    After the filing of the lawsuits that you

17   are here for today, did Ms. Garcia contact you

18   about her payroll?

19        A    To the extent that she talked to me about

20   payroll as it relates to me giving her an

21   accounting opinion, I am going to assert the

22   privilege of the accounting client privilege.

23        MS. JAFF:  I am going to certify that

24   question.  But I am also not asking you about the

25   conversations I am asking it's a yes or no whether
```

```
 1    she consulted you about payroll.

 2         A    Yes.

 3         Q    Did you review any documents?

 4         A    No.

 5         Q    Were you the person who was responsible

 6    for doing the payroll for Ms. Garcia?

 7         A    No.

 8         Q    Can you explain to me why she consulted

 9    with you after the lawsuit with regards to her

10    payroll?

11         A    I have been a CPA for 35 years in this

12    town.  I think I know my stuff.

13         Q    Did she contact you about her tax returns

14    also and by she I mean Ms. Garcia?

15         A    She asked me questions about the tax

16    return.

17         Q    After the file of the lawsuit?

18         A    No.

19         Q    Would you look over the work of her

20    accountant?

21         A    No.  She would ask me general questions.

22         Q    And that was in a personal capacity or for

23    her firm?

24         A    That was I believe a professional

25    conversation.  Not a personal request.
```

```
 1      Q    So it would have been for her firm's taxes
 2   not for her own personal taxes?
 3      A    Both.
 4      Q    Did you hear any accusations about Ms.
 5   Perez being a thief or stealing after she filed
 6   the lawsuit?
 7      A    No.
 8      Q    Did you hear any accusations about Ms.
 9   Perez being a liar or a cheater after the lawsuit
10   was filed?
11      A    I don't recall.
12      Q    And as to Ms. Cini, did you hear any
13   accusations about her being a cheat or thief after
14   the lawsuit?
15      A    No.
16      Q    Did you hear anything about her being a
17   cheater or liar after she got the lawsuit?
18      A    No.
19      Q    How is has your opinion changed of Ms.
20   Cini since the filing of the lawsuit or since you
21   learned of the filing of the lawsuit?
22      A    I am disappointed that she filed the
23   lawsuit.
24      Q    Have you other than that?
25      A    That is it.  Can you explain to me how you
```

```
 1   are disappointed about her filing that?  I think

 2   Anastasia was an incredible person to her.  Once

 3   again, treating her like a daughter.  Treating

 4   Jenny's I believe son as a member of her family.

 5   Giving Jenny ample latitude, trust, love, care,

 6   guidance.

 7          I am very shocked and surprised that Jenny

 8   would seek overtime when she is not an hourly

 9   employee.  She is a manager she ran the office.

10   She was paid is a salary.  I am very shocked that

11   she would file retaliation claims.

12      Q    Were you at the trial, sir that happened

13   with regards to the overtime?

14      A    I was there approximately an hour and a

15   half.

16      Q    Do you recall what day you attended?

17      A    No.

18      Q    Not the date but the day of the trial?

19      A    No.

20      Q    If it was the first or second?

21      A    I don't remember that.

22      Q    And what made you decide to attend the

23   trial?

24      A    I was across the street in family court.

25      Q    Did Ms. Garcia can you to come and show
```

1   her support?

2        A    No.

3        Q    Did Ms. Garcia ask you to come at all?

4        A    No.  I was in the area.

5        Q    And when you attended the trial, what were

6   your thoughts?

7        A    I didn't have any thoughts.

8        Q    Did you speak with Ms. Garcia at all

9   during the trial?

10       A    No.

11       Q    When did there was break you didn't speak

12  with Ms. Garcia with the trial?

13       A    No.  As a matter of fact, there was no

14  break.  I went in and out.

15       Q    Did you talk with Ms. Perez at all during

16  the trial?

17       A    No.  I haven't spoken to Ms. Perez since

18  she left the employment.

19       Q    Did you just speculate at all during the

20  trial to Ms. Garcia?

21       A    No.

22       Q    Did you mouth anything to her during the

23  trial?

24       A    No.

25       Q    Did you mouth any curse words to Ms. Perez

```
 1    During the trial?
 2        A    No.
 3        Q    How about Ms. Cini?  Did you speak to her
 4    at all way during the trial?
 5        A    No.
 6        Q    Did you gesture to her in any way during
 7    the trial?
 8        A    No.
 9        Q    When was the last time that you spoking to
10    Ms. Perez?
11        A    Again when she was employed by Mrs.
12    Anastasia Garcia.
13        Q    And when was the last time that you spoke
14    with Ms. Cini?
15        A    I don't remember.  But it was during her
16    employment with Anastasia Garcia.
17        Q    And what was your reaction when you heard
18    that Ms. Cini was part of lawsuit?
19        A    No reaction.
20        Q    And how is your opinion of Ms. Cini
21    changed?
22        A    I didn't have any opinions to begin with.
23        Q    Did you hear about the outcome of the
24    trial?
25        A    Yes.
```

```
1       Q     And what did you hear about the outcome of
2   the trial?
3       A     There was an amount required to be paid by
4   Anastasia to Ms. Perez.
5       Q     Do you know if there was amount that the
6   jury awarded to Ms. Cini?
7       A     Yes.
8       Q     Do you know what the amount for?
9       A     I don't know.
10      Q     Do you know that the jury found that Ms.
11  Cini was not an exempt employee?
12      A     No.  I don't.
13      Q     Did you review the jury verdict?
14      A     No.
15      Q     Did you ask her to bill to pull that from
16  the docket?
17      A     I did not.
18      Q     Have you seen it at all the jury verdict?
19      A     I have not.
20      Q     Is it surprising to her that Ms. Cini was
21  found by the jury not to be an exempt employee, I
22  mean Ms. Perez not to be an exempt employee?
23      A     Surprised?
24      Q     Uh-huh?
25      A     Nothing surprises me anymore.
```

```
1        Q    Does that change your feeling about her
2    being an exempt employee and manager as you said
3    earlier?
4        A    It doesn't change it.  I still have the
5    same opinion.  She was a manager.  She was paid a
6    salary.  It doesn't change.
7        Q    Does it change your opinion of Ms. Perez
8    knowing that she was awarded a jury verdict?
9        A    It doesn't change any.
10       Q    Before the lawsuit, would you have hired
11   Ms. Perez?
12       A    No.
13       Q    Why not?
14       A    Not capable of handling any functions in
15   my office.
16       Q    What do you mean by that?
17       A    She is not an accountant.
18       Q    Could she not work in the capacity of
19   answering the phones?
20       A    Yes.
21       Q    You don't think she would be qualified for
22   that?
23       A    I do.
24       Q    How about after the lawsuit was filed
25   would you hire her?
```

```
 1       A     I don't have a reason to hire her in the
 2   sense that I don't have a need.
 3       Q     If someone asked you as a recommendation
 4   as to whether or not they should hire Ms. Perez
 5   would you answer in the affirmative or negative?
 6       A     I usually do not give out any
 7   recommendations to anyone regarding hirings of any
 8   type.  I don't give out recommendations so I would
 9   deny any recommendations if asked.  That is my
10   policy.
11       Q     And that is across the board not just as
12   to Ms. Perez?
13       A     Across.
14       Q     As to Ms. Cini would you have hired her
15   before the instant lawsuit was filed?
16       A     Same answer.
17       Q     And after the filing of the lawsuit?
18       A     Same answer.
19       Q     Have you heard of any other family law
20   attorneys discussing the instant lawsuit?
21       A     No.
22       Q     No one has talked to you about the lawsuit
23   that Ms. Garcia has?
24       A     Not really.
25       Q     I think you said that you said you deal
```

```
 1    With 50 to 100 attorneys on -- the attorneys are
 2    your clients, 50 to 100, is that attorneys or are
 3    you talking about the attorney's clients?
 4        A    No.  I deal with 50 to 100 attorneys,
 5    correct.
 6        Q    Out of that 50 to 100 attorneys, are they
 7    primarily family law attorneys?
 8        A    Yes, but not necessarily.
 9        Q    Out of the 50 to 100, what would you say
10    is the percentage of them being family law
11    attorneys?
12        A    Probably 90 percent.
13        Q    Out of those 90 percent attorneys that you
14    deal with, none of them have discussed the instant
15    lawsuit with you?
16        A    Look, the family law Bar is very close net
17    Bar.  Everybody knows about this lawsuit.  Have
18    there been discussions, have I been in the room.
19    Yes, I don't recall the specifics.
20        Q    When the attorneys that you deal with
21    discussing the lawsuit are they speaking
22    negatively of Ms. Perez?
23        A    They are shocked.
24        Q    For the same reason that you said that you
25    are shocked?
```

```
1      A      Absolutely.
2      Q      Do they talk negatively about Ms. Perez?
3      A      They are shocked they don't have an
4  opinion as to Ms. Perez, they are shocked.
5      Q      And when they talk about the lawsuit,
6  these 50 or 90 percent of your clientele that are
7  family law attorneys, do they talk about Ms. Cini
8  at all?
9      A      No.
10      Q      Only about Mr. Perez?
11      A      Correct.
12      Q      And why do you think that is?
13      A      They don't know her, Ms. Cini.
14      Q      When the lawsuit was filed, did you hear
15  anything about Ms. Garcia changing the locks?
16      A      No.
17      Q      To her building?
18      A      No.
19      Q      Did you hear about any issues with regards
20  to Ms. Cini and Ms. Perez as access to their files
21  and to the computer files?
22      A      No, I wouldn't know that.  My office is
23  five miles a way.  I am not there.
24      Q      And Ms. Garcia never discussed that with
25  you?
```

```
 1        A    No.
 2        Q    Did you hear about any of the family law
 3   attorneys that you deal with receiving any kind of
 4   communications or e-mails from Ms. Garcia about
 5   Ms. Perez?
 6        A    No.
 7        Q    And have the same question as to Ms. Cini?
 8        A    No.
 9        Q    Do you know why Ms. Perez left?
10        A    No.
11        Q    Do you know why Ms. Cini left?
12        A    No.
13        Q    Do you know if Ms. Garcia started treating
14   Ms. Perez in any different manner after the filing
15   of the lawsuit?
16        A    I don't.
17        Q    Do you know if she treated Ms. Cini in any
18   different way after the filing of the lawsuit?
19        A    I don't.
20        Q    Do you know if Ms. Garcia hired anybody
21   temporary prior to Ms. Garcia and Ms. Perez ending
22   their employment?
23        A    I don't.
24        Q    Do you think after the trial the family
25   law attorneys that you deal with, would not hire
```

1    Ms. Perez?

2           MS. FRAGA:  Object to form.

3       Q    For work for them?

4       A    Not to hire you have to ask them.  I don't

5    know.  I have no idea what they would do and not

6    do.

7       Q    Do you think that Ms. Perez has been black

8    listed in the family law arena?

9           MS. FRAGA:  Object to form.

10      A    No.  No.

11      Q    Do you think that about Ms. Cini?

12      A    No.

13      Q    Despite the fact that you say that all the

14   attorneys are discussing how shocked they are

15   about the lawsuit?

16      A    Shocked may not mean anything.  It may if

17   they have a need to hire an employee and they want

18   to hire Jenny, go ahead.  I am not preventing or

19   talking to these attorneys not to hire them.  They

20   are their own firm and their own people.

21      Q    Do you think that the filing of the

22   lawsuit has changed your opinion of Ms. Perez's

23   honesty?

24      A    Yes.

25      Q    And how so?

1        A     I have already said but I will say it

2   again.  Anesthesia Garcia was very kind, generous,

3   great boss provided guidance, counseling, taught

4   her, and trusted her, created a good working

5   environment.  And paid her a salary.  Gave her the

6   managerial duties of her office.  And I am shocked

7   that Jenny would file a lawsuit against Ms.

8   Garcia.  I am shocked that Jenny would file a

9   retaliation against Ms. Garcia.  In all these

10  years I have never witnessed any animosity between

11  them.  Any adverse business environments or any

12  problems between them.

13         As a matter of fact, all I saw was

14  kindness, good working relationship, a good

15  friendship and a lot of trust to each other.  And

16  I saw Jenny very happy all the time.

17       Q     Are you shocked that Ms. Perez demanded

18  her legal rights?

19       A     Everybody has that right.  I am not

20  shocked about anything that aspect of it if she

21  feels that she has a legal right, who am I to

22  prevent that for anyone.

23       Q     What do you mean by that respect of it?

24       A     I just said what I said.  I don't

25  understand what you are asking me now to.

```
 1        Q     Are you shocked that Ms. Cini asserted her
 2   legal rights?
 3        A     No.  I am not talk shocked about anybody
 4   asserting any rights that they feel they may have.
 5              MS. JAFF:  Okay I am going to take a
 6   five-minute break if that is okay.
 7              (A break was taken.)
 8   BY MS. JAFF:
 9        Q     With regards to your involvement in kit
10   side, how often does Kids Side have events like
11   the galas and the different after-work parties
12   that you had discussed?
13        A     It's probably like four or five events a
14   year.
15        Q     And it's my understanding that your wife
16   is involved in helping to plan those events a long
17   with Ms. Garcia; is that correct?
18        A     She a member of the galas committee.
19        Q     Do you recall Ms. Perez coming and helping
20   out with your wife and Ms. Garcia at your house
21   for any of the events?
22        A     Yes.
23        Q     And would you say that Ms. Perez was
24   professional?
25        A     Yes.
```

```
 1      Q    These events, do any of the judges attend
 2  those events?
 3      A    Some.
 4      Q    Are these the judges that deal with family
 5  lawyers in family court?
 6      A    Not necessarily.
 7      Q    How much of the judges would you say are
 8  family law judges?
 9      A    Maybe half.
10      Q    Since the filing of the lawsuit, have any
11  of these judges heard of this lawsuit that Ms.
12  Perez and Ms. Cini had?
13           MS. FRAGA:  Object to form.
14      A    I don't know.
15      Q    Have you had an opportunity with Kids Side
16  since the filing of the lawsuit?
17      A    Yes.
18      Q    Have any of the judges come up and speak
19  about the lawsuit this with you?
20      A    Absolutely not.
21      Q    Have any of the family law attorneys come
22  up and discussed the file of the lawsuit with you?
23      A    No.
24      Q    You said that I am obviously not a family
25  law attorney you said that the family law arena is
```

```
 1    very close tightknit community, correct?
 2         A    Just like any specialized Florida Bar, for
 3    example, probate Bar is very algebra you mean, tax
 4    Bar is very tight because you practice with these
 5    professional all the time.  It's not to say that
 6    with all and all specialties.
 7         Q    Do you think that is the same with regard
 8    to the judges that deal with the family court?
 9         A    No.  Judges are judges.  Don't ask that
10    why would you ask that?  That is amazing would you
11    ask something like that.
12         Q    Why is that amazing?
13         A    Judges please, come on.  Judges are
14    integral people, respect the system.  That is
15    amazing you would ask something like that.
16    Amazing, truly amazing that you would question the
17    integrity of judges.
18         Q    I am not questioning.
19         A    Yes, you are questioning.
20         Q    First of all I am not I am done having
21    this conversation?
22         A    Your question I am not finished.  I am not
23    finished.
24         Q    I am going to strike his answer.
25         A    She is going to fight.
```

```
 1      Q     I am want to make him --
 2      A     You are questioning the integrity of
 3   judges?
 4      Q     Don't ever accuse of me of anything.  Do
 5   you understand?
 6      A     I am not accusing.
 7      Q     Yes, you are, you just accused me of
 8   something.  If you want to get into argument about
 9   this we can do so off the record after your
10   deposition.
11      A     You have questioned integrity of judges.
12      Q     Do you do you know about the trial that
13   Ms. Garcia had?
14      A     I don't remember.
15      Q     You said that you heard about it, how did
16   you hear about the trial going on?
17      A     The trial is going on?
18      Q     Uh-huh.
19      A     I don't remember how I heard it.
20      Q     You said that you attended the trial?
21      A     Yes.
22      Q     How do you know that it was going on so
23   you could attend it?
24      A     I don't remember how I heard it.  I knew
25   that there was a trial going on.  My answer is I
```

```
 1    don't remember.  Somebody could have told me.  I

 2    don't remember.

 3         Q    Okay.  That is a fair answer.

 4         A    Okay.

 5         Q    Do you know if there were any other

 6    attorneys that attended the trial?

 7         A    I don't.

 8         Q    When you were there in the courtroom were

 9    there any other attorneys?

10         A    There was one.

11         Q    Who was the other attorney?

12         A    Jeanette Hernandez.

13         Q    Did you discuss with her about the case?

14         A    No.

15         Q    Did you walk out?

16         A    No.

17         Q    Have you discussed the trial or the case

18    with Jeanette Hernandez?

19         A    No, I have not.

20         Q    Never ever?

21         A    Never ever.

22         Q    You said that Ms. Perez helped out at the

23    Kids Side event.  So you know her in a work,

24    capacity; is that correct?

25         A    I wouldn't say that is a working capacity.
```

```
 1   She helped out in an event.  That is not a working
 2   capacity.  She helped out.
 3       Q    You said that Ms. Perez was compensated
 4   for that?
 5       A    Yes, she was.
 6       Q    Do you not consider that as working
 7   capacity?
 8       A    I would consider that an event that she
 9   helped check people in and she got compensated.
10   That is the extent of her duties.
11       Q    If Mr. Perez listed you as a
12   recommendation for a recommendation, what would
13   your recommendation be?
14       A    So I answered this question again and I am
15   going to answer it again.  I don't give out
16   recommendations.  Policy of mine and my firm.  I
17   don't recommend anybody.
18       Q    Even people that work for you?
19       A    I don't.
20       Q    Did you approach any of the witnesses at
21   the trial?
22       A    No.
23       Q    Did you speak with Ms. Garcia's past
24   employer what is her name?
25            MS. PEREZ:  Natalia Rodriguez.
```

```
 1        Q    Natalia Rodriguez?

 2        A    No.  That was the plaintiff from

 3   yesterday.

 4        Q    Did Ms. Garcia ever tell you that she was

 5   going to be firing Ms. Perez?

 6        A    I don't remember.

 7        Q    Did you hear about Ms. Garcia ever

 8   thinking about firing Ms. Cini?

 9        A    No.

10        Q    She never told you that she was going to

11   be firing Ms. Perez?

12        A    Never.

13        Q    She never told you she was going to go

14   fire Ms. Cini?

15        A    Never.

16        Q    Can Ms. Garcia ever tell you that she was

17   going to be hiring new secretaries?

18        A    No.

19        Q    Would Ms. Garcia have consulted you if she

20   was thinking about hiring new staff?

21        A    No.

22        Q    Did you attend any Christmas parties with

23   your firm and Ms. Garcia's firm?

24        A    Yes.

25        Q    And when you attended those, were they at
```

```
 1     your firm or at Ms. Garcia's firm?

 2          A     They were outside of the firm.

 3          Q     And did you meet Ms. Cini and her husband

 4     there?

 5          A     Maybe.

 6          Q     Do you recall meeting them?

 7          A     Maybe.  I don't recall.  Maybe.  It's a

 8     bunch of people in that function.  My staff or

 9     staff.  I don't remember.

10          Q     And do you remember meeting Ms. Perez's

11     husband in any of the Christmas parties?

12          A     I don't remember.  I don't remember.

13          Q     Do you know if Jeanette Hernandez has

14     working relationship with Ms. Garcia?

15          A     I don't know.

16          Q     Do you know if she as a personal

17     relationship with Ms. Garcia?

18          A     They seem to be friends, yes.

19          Q     Do you know how long they have known each

20     other for?

21          A     I don't.

22          Q     Have you ever discussed Ms. Perez with

23     Ms. Hernandez?

24          A     No.

25          Q     Never?
```

```
 1        A    Ever.

 2        Q    Have you ever discussed Ms. Cini with

 3   Ms. Hernandez?

 4        A    Never.

 5             MS. JAFF:  I have no more questions.  Do

 6   you have any questions?

 7             MS. FRAGA:  I have no questions.

 8             MS. JAFF:  Okay.  Do you have want to read

 9   or would you like to waive.

10        A    I will waive.

11             MS. JAFF:  Perfect.  You are done.

12             (Ending time 11:20 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2                    CERTIFICATE OF OATH

 3

 4    STATE OF FLORIDA    )
                          ) SS:
 5    COUNTY OF MIAMI-DADE)

 6

 7          I, ROCHEL ALBERT, Certified Shorthand

 8    Reporter and Notary Public in and for the State of

 9    Florida at Large, certify that the witness,

10    personally appeared before me and was duly sworn.

11

12          WITNESS my hand and official seal this

13    18th day of December, 2016.

14

15          _____

16                      ROCHEL ALBERT, CSR
                        Notary Public, State of
17                      Florida

18

19

20

21

22

23

24

25
```

```
 1
 2                REPORTER'S DEPOSITION CERTIFICATE
 3
 4        I, ROCHEL ALBERT, Certified Shorthand
 5  Reporter, certify that I was authorized to and did
 6  stenographically report the foregoing deposition;
 7  that the foregoing transcript of said witness is a
 8  true and complete record of my stenographic notes of
 9  the deposition by said witness; and that this
10  computer-assisted transcript was prepared under my
11  supervision.
12        I further certify that I am not a
13  relative, employee, attorney or counsel of any of
14  the parties, nor am I a relative or employee of any
15  of the parties, attorney or counsel connected with
16  the action.
17        DATED this 18th day of December, 2016.
18
19
20        _____
21                ROCHEL ALBERT, CSR
                  Notary Public, State of Florida
22                at Large.  My commission expires.
                  September 4, 2017.  Bonded
23                through Budget Notary Services
                  Commission Number FF 049654
24
25
```