UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 15-20615-CIV-O'SULLIVAN

[CONSENT]

YENISEY PEREZ, et al,
      Plaintiffs,

v.

ANASTASIA M. GARCIA, P.A., et al,
      Defendants.
_____/

## ORDER

THIS MATTER comes before the Court on the Plaintiffs' Motion for Summary Judgment (DE# 177, 7/27/16) and the Defendants' Motion for Summary Judgment on the Retaliation Claims (DE# 179, 7/27/16). The Court has reviewed the applicable filings and the law and held a hearing on December 15, 2016. Following the hearing, the Court allowed the parties to supplement the record by filing certain documents. See Plaintiffs' Notice of Compliance with the Court's Order [DE 203] (DE# 205, 12/15/16); Notice of Compliance on Supplementing Filings to Motion for Summary Judgment (DE# 206, 12/15/16); Plaintiffs' Notice of Filing Transcripts (DE# 210, 12/19/16). This matter is ripe for adjudication.

## ANALYSIS

**A.**    **Legal Framework**

Under the Fair Labor Standards Act ("FLSA"), it is unlawful "to discharge or in any manner discriminate against any employee because such employee has filed any complaint . . . under or related to this chapter." 29 U.S.C. § 215(a)(3).

Where there is no direct evidence of retaliation, FLSA retaliation cases are

analyzed according to the burden-shifting analysis employed by the courts in cases brought pursuant to Title VII of the Civil Rights Act.  See e.g., Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-43 (11th Cir. 2000). To make a prima facie case for retaliation under the FLSA, the plaintiffs must show: 1) that they engaged in an activity protected by the FLSA that was known to their employer; 2) that they suffered an adverse action, and 3) that there was a causal connection between the participation in the statutorily-protected activity and the adverse action. Id.

Under the burden-shifting approach, once the plaintiffs have made out a prima facie case of retaliation, the defendant must come forward with "legitimate reasons for the employment action to negate the inference of retaliation." Taylor v. Runyon, 175 F.3d 861, 868 (11th Cir. 1999) (quoting Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir.1993)). If the defendant demonstrates a non-discriminatory reason for the adverse action, the presumption of retaliation arising from the prima facie case is eliminated. At this point, the burden shifts back to the plaintiffs to produce evidence "sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).

**B.     Whether Plaintiff Perez Engaged in Protected Activity Before the February 5, 2015 Email**

At the December 15, 2016 hearing, the plaintiffs argued that Ms. Garcia had been aware that Ms. Perez would be asserting her rights to overtime because on two occasions Ms. Perez told Ms. Garcia that Ms. Perez could no longer work past 5:40 PM. See Deposition of Yenisey Perez, May 4, 2016 (DE# 205-1 at 6, 8-9, 12-16, 27,

12/15/16); Deposition of Yenisey Perez, May 6, 2015 (DE# 205-1 at 37-42, 12/15/16).

Ms. Perez could not recall exactly when these two conversations with Ms. Garcia took

place, but testified it was either in 2014 or 2015. See Deposition of Yenisey Perez, May

4, 2016 (DE# 205-1 at 9, 12/15/16); Deposition of Yenisey Perez, May 6, 2015 (DE#

205-1 at 39, 12/15/16). Ms. Cini believed that Ms. Perez complained to Ms. Garcia

about the hours "a little bit before [the plaintiffs] decided to go to [the plaintiff's attorney],

maybe that month." Deposition of Cintia Cini, May 27, 2016 (DE# 205-1 at 47,

12/15/16).

Although Ms. Perez testified that she told Ms. Garcia that she could no longer

work overtime,[1] it is clear from her description of the substance of her conversations

with Ms. Garcia that Ms. Perez did not list not being paid overtime as a reason for no

longer being able to work past 5:40 PM. Rather, Ms. Perez provided Ms. Garcia with

---

[1] See Deposition of Yenisey Perez, May 4, 2016 (DE# 205-1 at 6, 12/15/16) ( "I had already explained to Ms. Garcia that I no longer could work overtime"); id. at 8 ("I had already mentioned it to her twice **that I couldn't no [sic] longer keep doing overtime**."); id. at 13 ("A. Mr. Marban, **I had already been talking about overtime to Ms. Garcia from before**. Q. When? A. What do you mean when? I said it in my first depo. I mentioned it in my first depo. I don't remember the exact dates. And I said it again now. **I spoke to Ms. Garcia a few months before about overtime. Ms. Garcia knew that overtime was in my head**."); id. ("**And Ms. Garcia, I spoke to Ms. Garcia myself and I told her that I couldn't stay past 5:40 anymore. She knew that overtime was an issue with me**."); id. at 27 ("**when I spoke to her about the overtime, I said, "Listen, I can't do the overtime," and that's when I started doing my research and that's when I started looking up the laws in overtime**."); id. at 28 ("**It was months before I even asked for my overtime, when I brought it up to her attention that I no longer could work overtime**.").

other reasons including taking care of her son:

> Q. From what I recall from your deposition is that you would be afraid to complain to her because of her demeanor, because of her personality.
>
> A. I was always afraid to complain to her, **but when it came to overtime on two occasions, I spoke with her. <u>And I told her that I could no longer stay pas[t] 5:40 in the office.</u> And she simply brushed it off.** Cintia was there when I brought it up. **She would even make comments about Yenisey doesn't, can't stay because she has a Julian[2] excuse.**
>
> ***
>
> Q. So you did complain to her about overtime?
>
> A. Of course. Of course. **I complained to her. The conversation was in front of Ms. Cintia when she even made fun of me and said, <u>Yeah, that's right, Ms. Yenisey had the Julian excuse.</u> And she even told me to my face that that will be a problem to her that I could not stay past 5:40. In my view, it was for free.**
>
> Q. But I thought you testified before that you couldn't stay past 5:40 because you have moved to the - -
>
> A. **<u>When I moved, whether it was because I had a doctor's appointment, whether it was that I sat here, whatever the excuse was, the reality of the situation is that I was working for free past 5:00</u>, and I was not being taken into consideration. <u>Whether I said it was because I lived far or whether I said it is because I have a son, I still have my rights</u>. I'm a human. I live in the United States. It's a free country.**

Deposition of Yenisey Perez, May 4, 2016 (DE# 205-1 at 14-16, 12/15/16) (emphasis added); <u>see</u> <u>also</u> <u>id.</u> at 6 ("[Ms. Garcia] always had a hard time understanding that I had a personal life outside of the office.").

During her first deposition, Ms. Perez similarly testified that she told Ms. Garcia she could not work past 5:40 PM and cited childcare issues:

---

[2] Julian is Ms. Perez's son.

Q. And what made you complain about overtime?

A. What made me complain about overtime?

Q. Yes.

A. Someone that works, I want to say -- I want to say 24/7, I would say 25, you get exhausted. And I was tired and, **like I mentioned before, I brought it up to her attention that I couldn't stay longer in the office past 5:40. She said that would be a problem to her.** And then she - - I don't remember the exact date when she sent me a text message saying that if I wanted to leave and she was in mediation, I had to check in with her. And I left that day at like 5:10 or five something. <u>**So, you know, I have a child and I have to also attend to my son. And whenever I would say I have to go and it was 5 o'clock, after 5:00, she would say that -- Miss Cini is a witness and you can ask her tomorrow --  she would say, oh, Yenny, has the Juli[a]n baby excuse or the baby excuse, whatever, those were the words.**</u>

***

Q. Going back to the e-mail, so you made your first complaint on February 5th, 2015. **Did you make any complaints in 2014?**

A. I told her that I couldn't work past a certain amount of time.

 **Q. Did you complain about the salary you were getting in 2014?**

**A. I don't remember.**

**Q. And you told her you couldn't work past what time?**

**A. <u>5:40 and her answer was that's a problem to me. And I told her well, I'm sorry, I have a child.</u>**

Q. So after that you stopped working after 5:40?

A. No, I still worked. I still worked a little bit, up until I want to say towards the end, January, February, that I just, I would -- my panic attacks, like I call it panic attacks but I would just have like a mental breakdown and I would get upset and I couldn't take it anymore. It was a toxic environment because I felt abused and taken advantage for five years.

Deposition of Yenisey Perez, May 6, 2015 (DE# 205-1 at 37-42, 12/15/16) (emphasis

added).

Ms. Cini's deposition testimony is consistent with Ms. Perez citing her childcare

responsibilities as the reason for no longer being able to work past 5:40 PM:

> Q. What do you know about that, when did she complain about failure to pay overtime wages to Ms. Garcia?
>
> ***
>
> Q. Let me know what you remember.
>
> **A. [Ms. Perez] would complain that there is too much work; that she couldn't stay after hours anymore. <u>Ms. Garcia would call it the Julian excuse</u>.**
>
> Q. Okay. Anything else specifically you recall about the complaints by Ms. Perez?
>
> ***
>
> THE WITNESS: There were complaints. **[Ms. Perez] would complain about the hours, about the amount of work we had. And, <u>Ms. Garcia, she doesn't have kids, she doesn't have a family so she doesn't understand what it is to have to be home at five</u>**. She thinks everybody has to be that way and it is not fair.

Deposition of Cintia Cini, May 27, 2016 (DE# 205-1 at 46, 12/15/16) (emphasis added).

With respect to the FLSA anti-retaliation provision, the Eleventh Circuit has

stated:

> Although the filing of a complaint under § 215(a)(3) need not be in the form of an official complaint, <u>see</u> <u>E.E.O.C. v. White & Son Enters.</u>, 881 F.2d 1006, 1011 (11th Cir. 1989), or even be in writing, **some degree of formality is required in order that the employer has fair notice that an employee is lodging a grievance**. <u>Kasten</u>, 131 S.Ct. at 1334-36. This "notice requirement" is essential because "an employer who does not (or should not) know an employee has made a complaint could [not] discriminate because of that complaint." <u>Id.</u> at 1335-36. In keeping with this idea, **the complaint must be sufficiently clear and detailed so that a reasonable employer, considering the context and content, can understand that an employee is asserting rights provided by the FLSA and calling for the protection of those rights**. <u>Id.</u>

Miller v. Roche Sur. & Cas. Co., 502 F. App'x 891, 894 (11th Cir. 2012) (emphasis added).

Ms. Perez' statements to Ms. Garcia about no longer being able to work past 5:40 PM were not "sufficiently clear and detailed so that a reasonable employer, considering the context and content, [could] understand that [Ms. Perez was] asserting rights provided by the FLSA and calling for the protection of those rights." Miller, 502 F. App'x at 894. There is no record evidence that Ms. Perez told Ms. Garcia that one of the reasons Ms. Perez could no longer work past 5:40 PM was because she was not being paid overtime. Rather, Ms. Perez provided Ms. Garcia with other reasons (moving to another residence, having a doctor's appointment, taking care of her son) for no longer being able to work past 5:40 PM. See Deposition of Yenisey Perez, May 4, 2016 (DE# 205-1 at 15-16, 12/15/16). Based on this record, the Court finds that Ms. Perez did not engage in protected activity at any time before she sent the February 5, 2015 email.

## C.    Protected Activity

On February 5, 2015 at 10:18 PM, Ms. Perez sent an email to Ms. Garcia stating: "During this five years of employment for you I have worked many hours of overtime. I kindly request to be compensated for such hours." See February 5, 2015 Email (DE# 178-4 at 2, 7/27/16). On February 9, 2015 at 2:34 PM, the plaintiffs' counsel sent an email to Ms. Garcia notifying her that Ms. Perez and Ms. Cini had retained counsel to recover overtime pay and that Ms. Perez had an additional claim for retaliation. See February 9, 2015 Email (DE# 178-5 at 1, 7/27/16). Both emails

constitute protected activity under the FLSA.

**D.    Adverse Action/Constructive Discharge**

 "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006) (Title VII case). "For an action to be an adverse action in the context of retaliation, the action 'must be harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Adams v. City of Montgomery, 569 F. App'x 769, 772 (11th Cir. 2014) (per curiam) (alteration in original) (quoting Burlington, 548 U.S. at 57, 68).

The plaintiffs assert that the following conduct were adverse actions:

> 1) Defendant Garcia became extremely and overtly hostile towards Plaintiffs and began to constantly shout and curse at Plaintiffs; (2) Defendants switched the locks to Defendants' office so that Plaintiffs could not access the building; (3) Defendants barred Plaintiffs from accessing their computers and Plaintiffs were unable to complete their work until Defendants' associate, [Frank] Pumarejo, would sign in for Plaintiffs; (4) Defendants continued to advise other employees that Plaintiffs were not to be trusted, were thieves, and accused Plaintiffs of theft; (5) Defendants instituted a time-clock and required Plaintiffs to clock-in and clock-out, including for a mandatory one-hour lunch break; (6) Defendants instituted a new policy so that payroll was issued by-weekly, instead of weekly; (7) Defendants instructed Plaintiffs to complete certain tasks and then would send emails to Plaintiffs' Counsel stating Plaintiffs refused to complete the tasks and were acting insubordinate; (8) Defendants positioned a temporary employee to sit behind Plaintiffs to ensure they were performing their work; (9) Defendants sent negative employment references and communicated in a derogatory manner to other attorneys in the family law area, thereby black-balling Plaintiffs in their job-field; and (10) Defendants called Plaintiffs derogatory names (i.e. "descarada" /gutter-rats) and humiliated Plaintiffs in front of co-workers and other attorneys attending mediations.

Plaintiffs' Motion for Summary Judgment (DE# 177 at 11, 7/27/16). In addition to these

enumerated reasons, the plaintiffs also assert that: (1) the office keys and the keys to Ms. Garcia's house were taken from Ms. Perez; (2) Ms. Garcia threw a notepad at Ms. Cini's desk which hit her hand and threw a stapler at Ms. Perez' desk which hit a file in Ms. Perez' hand and caused Ms. Perez to sustain a paper cut; (3) Ms. Garcia accused Ms. Perez of stealing the mail key and (5) Ms. Garcia required that Ms. Perez drive home to retrieve a client backup file.

For the reasons stated below, the Court finds that none of the aforementioned actions either individually or taken as a whole are sufficient to amount to a constructive discharge and that the majority of the alleged ill-treatment of the plaintiffs does not constitute adverse actions.

### i)      Competent Record Evidence

At the outset, the undersigned notes that while a negative employment reference or derogatory comments to others in the legal community may constitute an adverse action, the plaintiffs have failed to present record evidence to support that the defendants engaged in such conduct. With respect to this alleged conduct, the plaintiffs merely cite to their own affidavits which are based on "information and belief." At the summary judgment stage, the plaintiffs must point to record evidence and cannot rely on unsupported factual assertions. See So. Solvents, Inc. v. New Hampshire, Ins. Co., 91 F. 3d 102, 104 (11th Cir. 1996) (per curiam) (stating that when the movant meets its burden on summary judgment, "the non-movant must then designate, by affidavits, depositions, admissions, and answers to interrogatories, specific facts showing the existence of a genuine issue for trial."). To support their assertion that the defendants

have "blackballed" them in the family law community, the plaintiffs have filed the
deposition testimony of Paul Garcia wherein Mr. Garcia testified that the family law bar
is a small community and the family law attorneys were aware of the lawsuit and were
"shocked" by it. Noticeably absent from Mr. Garcia's deposition transcript is any
testimony that defendant Anastasia Garcia made any comments, let alone negative
comments, about the plaintiffs to the legal community. The filing of a lawsuit is a public
matter and Mr. Garcia himself obtained a copy of the complaint filed in this lawsuit
through an attorney friend (not defendant Garcia) because he was interested in the
lawsuit. The plaintiffs have produced no record evidence tying defendant Garcia to the
alleged "black-balling" of the plaintiffs in the family law community.[3]

Thus, the plaintiffs have failed to present any competent record evidence that
Ms. Garcia "blackballed" them in the family law community or that Ms. Garcia sent
negative employment references.

**ii)      Constructive Discharge**

The plaintiffs have also failed to show that they were constructively discharged.
"Courts within the Eleventh Circuit have either assumed or decided that a constructive
discharge may constitute an adverse employment action for purposes of showing
retaliation – under the anti-retaliation provisions of the FLSA and other statutes."

---

[3] Plaintiff Perez also asserted that Paul Garcia cursed at her during the overtime
trial. Paul Garcia denies that he engaged in this behavior. In any event, Mr. Garcia's
alleged actions have not been tied to defendant Anastasia Garcia and therefore cannot
constitute an "adverse action." There is also no record evidence that Ms. Garcia caused
Ms. Perez to be evicted from her home, caused Ms. Perez to be fired from her job with
attorney Kathryn Hamilton or told attorneys attending the trial to make derogatory
comments to the plaintiffs.

Bartolon-Perez v. Island Granite & Stone, Inc., 108 F. Supp. 3d 1335, 1340 (S.D. Fla. 2015) (citing examples). "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." Poole v. City of Plantation, Fla., No. 05-61698-CIV, 2010 WL 4063728, at *7 (S.D. Fla. Oct. 14, 2010) (citing Bryant v. Jones, 575 F.3d 1281 (11th Cir. 2009) quoting Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 244 (4th Cir.1997)).

The threshold for establishing constructive discharge is "quite high." Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001) (ADEA case); Bryant, 575 F.3d at 1298 (noting that ""[e]stablishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim."). "Before finding a constructive discharge, [the Eleventh Circuit] has traditionally required a high degree of deterioration in an employee's working conditions, approaching the level of 'intolerable.'" Hill v. Winn-Dixie Stores, Inc., 934 F.2d 1518, 1527 (11th Cir. 1991) (quoting Wardwell v. Sch. Bd. of Palm Beach Cnty, Fla., 786 F.2d 1554, 1558 (11th Cir. 1986)).

"In assessing constructive discharge claims, [the Court does] not consider a plaintiff's subjective feelings about his employer's actions, but whether a reasonable person in the plaintiff's position would be compelled to resign." Siudock v. Volusia Cnty Sch. Bd., 568 F. App'x 659, 664-65 (11th Cir. 2014) (alleging constructive discharge under the ADA).[4] "A constructive discharge claim is not a jury question unless a plaintiff

---

[4] "To analyze FLSA retaliation claims, courts use the familiar McDonnell Douglas framework applied to retaliation claims under Title VII, the ADEA and the ADA." Urzola v. Thumbelina Learning Ctr. Corp., No. 12-20767-CIV, 2012 WL 3757072, at *5 (S.D.

presents substantial evidence that employment conditions were intolerable." Id. (citing Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002)).

Moreover, claims of constructive discharge generally concern ongoing conduct, rather than a single, short-term event. See U.S. E.E.O.C. v. Dillard's, Inc., No. 6:07-cv-1496-Orl-19GJK, 2009 WL 789976, at *13 (M.D. Fla. 2009) (granting summary judgment for employer on a constructive discharge claim filed by one of the plaintiffs and noting that "[t]he Court's research indicates that the cases finding instances of a constructive discharge generally appear to feature long-term, pervasive harassment.") (Title VII case); see also Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996) (noting that "[a] constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation.") (Title VII case).

Here, Ms. Perez and Ms. Cini first exercised their protected right to demand overtime on February 5 and February 9, 2015, respectively. The last day of employment for both plaintiffs was Friday, February 13, 2015. Six workdays is an insufficient amount of time to conclude that the plaintiffs were constructively discharged in light of the nature of the allegedly retaliatory conduct asserted in the instant case. This is particularly true given that the plaintiffs missed work on some of those days during that six-day work period. For instance, Ms. Cini worked two of those six-work days.

The Court has examined the allegations of ill-treatment asserted by the plaintiffs

---

Fla. Aug. 28, 2012) (citation and internal quotation marks omitted);Phillips v. M.I. Quality Lawn Maint., Inc., No. 10-20698, 2010 WL 4237619, at *4 n. 7 (S.D. Fla. Oct. 21, 2010) (noting that "courts routinely examine FLSA retaliation claims under the same standards as Title VII retaliation claims.").

and concludes that none of the conduct cited by the plaintiffs, either considered individually or collectively, rises to the level of a constructive discharge.

### iii)     Adverse Action

Conduct does not have to rise to the level of a constructive discharge in order for it to constitute an adverse action under the law. "Conduct is 'materially adverse' in the retaliation context if it 'might have dissuaded a reasonable worker from making or supporting' an FLSA claim. . . . . However, the anti-retaliation provision 'protects an individual not from all retaliation, but from retaliation that produces an injury or harm,' such that 'petty slights, minor annoyances, and simple lack of good manners' are generally not sufficient." Kubiak v. S.W. Cowboy, Inc., 164 F. Supp. 3d 1344, 1366-67 (M.D. Fla. 2016) (citing Burlington, 126 S.Ct. at 2405).

Some of the conduct asserted by the plaintiffs – requiring the plaintiffs to punch in and out using a time clock, enforcing a one-hour lunch break, positioning a temporary employee to sit behind the plaintiffs, changing payroll to a bi-weekly basis and "send[ing] emails to plaintiffs' Counsel stating Plaintiffs refused to complete the tasks and were acting insubordinate" – do not constitute adverse actions. Here, there is no evidence that the plaintiffs suffered a harm from the aforementioned actions or that these actions "would have deterred a reasonable employee from making or supporting a charge of discrimination." Barnett, 550 F. App'x at 715.

The Court further finds that the plaintiffs' assertions that Ms. Garcia became "extremely and overtly hostile towards plaintiffs and began to constantly shout and curse at plaintiffs," threw a stapler at one of the plaintiffs, used degrogatory names and

humiliated the plaintiffs in front of co-workers and attorneys attending mediations, "continued to advise other employees that Plaintiffs were not to be trusted,[5] were thieves, and accused plaintiffs of theft," accusing Ms. Perez of stealing the mail key, requiring Ms. Perez to drive home to retrieve the client backup files were not adverse actions. See Smith v. City of Fort Pierce, Fla., 565 F. App'x 774, 778 (11th Cir. 2014) (stating that "glaring, slamming a door in an employee's face, inquiring into retirement plans, commenting that an employee is not a team player, blaming an employee for failed union negotiations, or harboring concerns over an employee's dependability and trustworthiness are not actions that would dissuade a reasonable worker from making or supporting a charge of discrimination."); Marshall v. Aryan Unlimited Staffing Sol./Fanueil Inc./MC Andrew & Forbs Holding, No. 12-81404, 2013 WL 836990, at *3 (S.D. Fla. Mar. 6, 2013) (finding that "general lack of professionalism and meanness on the part of defendant's staff, who allegedly isolated and shunned plaintiff as the only non-Carribean language speaking employee in the office" was not "adverse action"). "The anti-discrimination statutes do 'not guarantee a stress-free working environment.'" Barnett, 550 F. App'x at 715 (citing Hipp, 252 F.3d at 1233-34).

Arguably, the switching of locks and the changing of computer passwords could possibly constitute adverse actions. See, e.g., Smart v. City of Miami Beach, 1 F. Supp. 3d 1350, 1357 (S.D. Fla. 2014) (stating that "[p]laintiff's allegations that the City took her

---

[5] On February 5, 2015 at 10:22 PM, Ms. Garcia forwarded Ms. Perez' email demanding overtime payment to the associate (Frank Pumarejo) and stated "See Below told you you [sic] she cant be trusted." Email from Anastasia Garcia (DE# 205-2, 12/15/16).

computer and other items may, if true, support her claim that the City took materially adverse action against her in that such acts may deter a reasonable employee from bringing a discrimination claim."). The Court notes that the plaintiffs in the instant case still had access to the office and to the computers, they merely had to wait until the associate let them in and logged into the computer system. Nonetheless, even assuming <u>arguendo</u> that the switching of the locks and changing of the computer passwords constitute adverse actions, the defendants are still entitled to summary judgment because the plaintiffs have not shown causation and/or pretext for the reasons discussed below.

**E.    Causation**

Ordinarily, "[a] plaintiff can satisfy [the causation element] if she can prove a 'close temporal proximity' between the time her employer learned about her protected activity and her discharge." <u>Raspanti v. Four Amigos Travel, Inc.</u>, 266 F. App'x 820, 823 (11th Cir. 2008). However, in certain instances the mere temporal proximity between the protected activity and the adverse action is not enough to survive summary judgment. For instance, where the employer had contemplated taking action against the employee <u>before</u> the employee engaged in the protected activity. <u>See</u> <u>e.g.</u> <u>Dalton v. State of Fla., Dep't of Highway Safety & Motor Vehicles</u>, No. 11-23127-CIV-KING, 2012 WL 5306313, at *6 (S.D. Fla. Oct. 26, 2012) (granting summary judgment for employer on plaintiff's Title VII[6] and Florida Civil Rights Act retaliation claims where "Defendant

---

[6] "FLSA retaliation claims are governed by the same legal analysis applicable to retaliation claims under Title VII." <u>Munroe v. PartsBase, Inc.</u>, No. 08-80431-CIV, 2009 WL 413721, at *7 (S.D. Fla. Feb. 18, 2009) (citation omitted).

had already begun an investigation into Plaintiff's policy violation and was contemplating discipline at the time Plaintiff complained" concluding that "[t]he preexisting reason for Defendant's termination of Plaintiff's employment defeat[ed] the causal connection between Plaintiff's complaint of gender discrimination and the adverse employment action.").

In the instant case, there is record evidence that Ms. Garcia had contemplated changing the passwords <u>before</u> the plaintiffs engaged in protected activity. On February 4, 2015, the day before Ms. Perez engaged in protected activity, Ms. Garcia sent two emails to Frank Pumarejo, the associate. The first email was sent at 7:49 PM and stated:

> great. I am done. **I am talking to both of them tomorrow and if they don't f\*\*king like it, they can f\*\*king leave**. I am just warning you. This is f\*\*king bull shit. I'm tired of working this hard with laziness around me.
>
> **I don't trust that anyt[h]ing I told either one of them today got done correctly.**
>
> Cintia, at least, tries to correct her mistakes.
>
> **I feel like yenny is daring me to fire her and she may get her wish**. But, **I will detail all the reasons why because I am not paying unemployment for her either**.
>
> **I'm sick of this f\*\*king sh\*t**. I have been her[e] before, several times.

February 4, 2015 Email (DE# 206-4, 12/15/16) (emphasis added). Approximately fifteen minutes later, Ms. Garcia sent a second email to Mr. Pumarejo. That email stated as follows:

> aside from the long office email neither responded to, I sent 5 emails to yenny and 3 to cintia and not one response, despite me asking during the day.

The level of disrespect I feel in this office is making me sick.

They are both gone tomorrow. But I need to find someone to answer the phone. This will affect you because you are going to need to do discovery and sh*t until I find someone. **I am going to fire them both after the bills are done**.

**My cousin's partner has a[n] employment staffing agency. I am going to talk to him**.

This is f**ked up with the upcoming move, **but I can't take this**.

I printed all of the emails out and **this was the straw that broke the camel[']s back**.

I have called yenny three times after she left and she doesn't bother answering. I used to put up with her sh*t because I considered that she answers if I call her after hours and all that sh*t, but now she doesn't pick up the f**king phone.

To stay on the cell phone today, in my face, as if I am some f**king idiot just went too f**king far.

I'm sorry because it will affect you for a few days, but **I will find someone. I  have to change all of my passwords and all that sh*t, but I will do that in the next couple of days**.

I am only worried about having someone answer the phone to schedule mediations and sh*t but I will see how soon nick can get me someone here.

February 4, 2015 Email (DE# 180-1, 7/27/16) (emphasis added). It is undisputed that

Ms. Garcia did not ultimately fire the plaintiffs. It is also undisputed that the plaintiffs

remained at Ms. Garcia's firm for approximately six workdays after Ms. Perez asserted

her rights under the FLSA.

At the December 15, 2016 hearing, the plaintiff argued that Ms. Garcia was

already aware that Ms. Perez would be asserting a claim for unpaid overtime at the time

Ms. Garcia sent the February 4, 2015 emails. The plaintiffs rely on Ms. Perez'

deposition testimony that on two prior occasions, Ms. Perez told Ms. Garcia that Ms. Perez could no longer work past 5:40 PM. The Court finds that Ms. Perez' statements to Ms. Garcia were insufficiently detailed to alert Ms. Garcia to Ms. Perez' intention to seek unpaid overtime. See discussion, supra. Thus, the record evidence in this case is that at the time Ms. Garcia sent her February 4, 2015 emails indicating her intent to fire the plaintiffs after the bills were completed, the plaintiffs had not yet engaged in protected activity.

"In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken 'but for' the assertion of FLSA rights. Wolf v. Coca-Cola Co., 200 F.3d 1337, 1343 (11th Cir. 2000). For the reasons discussed above, the only conduct cited by the plaintiffs which arguably could constitute adverse actions is the switching of the locks and the changing of the computer passwords. However, before either plaintiff had engaged in protected activity, Ms. Garcia expressed her intention to change the passwords. See February 4, 2015 Email (DE# 180-1, 7/27/16) (stating "I have to change all of my passwords and all that sh*t, but I will do that in the next couple of days."). Ms. Garcia's decision to switch the locks is also consistent with that email. Therefore, the Court concludes that the plaintiffs cannot satisfy the causation element because they cannot "prove that the adverse action would not have been taken 'but for' the assertion of FLSA rights." Wolf v. Coca-Cola Co., 200 F.3d 1337, 1343 (11th Cir. 2000).

**F.    Pretext**

Even assuming that the plaintiffs have established a prima facie case of

18

retaliation, the defendants would still be entitled to summary judgment because the plaintiffs have failed to show pretext.

Ms. Garcia's February 4, 2015 email provides a legitimate, non-retaliatory reason for the changing of the passwords. Her stated intent to terminate the plaintiffs after the bills were completed is also consistent with her decision to change the locks. Ms. Garcia has also submitted an affidavit attesting that she called the Florida Bar for advice after she saw one of Ms. Perez' emails sent to a third party which contained client names and other confidential information. See Sworn Statement of Anastasia Garcia (DE# 179-1 at ¶16, 7/27/16). "[Ms. Garcia] confirmed that [she] had an ethical duty to prevent disclosure of confidential client information to third parties and immediately took the appropriate action." Id. Thus, the burden is on the plaintiffs to show pretext.

To establish pretext, the plaintiffs must demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherences or contradictions' in the employer's reasons for its actions that a reasonable fact finder could find them unworthy of credence.'" Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting Sheridan v. E.I. DuPont de Nemours and Co., 106 F.3d 1061, 1072 (3d Cir. 1996) (other citations omitted)). "[A] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, so long as the reason is one that might motivate a reasonable employer." Clark v. Alabama, 141 F. App'x 777, 788 (11th Cir. 2005).

In order to show pretext, the plaintiffs must demonstrate that the defendants'

19

proffered reasons were not the real reasons for the adverse action. Based on this record, the plaintiffs have not met their burden. The Court has already rejected the plaintiffs' argument that Ms. Garcia was aware of Ms. Perez' intent to seek unpaid overtime when Ms. Garcia sent the February 4, 2015 emails to Mr. Pumarejo. The plaintiffs also cite to Nick Alonso's deposition testimony that Ms. Garcia contacted him in 2016 (approximately one year after the plaintiffs' employment ended) inquiring about his staffing services. See discussion, infra. However, Ms. Garcia's apparent lack of follow through in contacting Mr. Alonso, does not negate the fact that on February 4, 2015 she expressed her intention to contact Mr. Alonso and inquire about staffing.

"[A] reason is not pretext for discrimination unless it is shown both that the reason was false and that discrimination was the real reason." Lee v. U.S. Steel Corp., 450 Fed. Appx. 834, 839 (11th Cir. 2012) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). Here, the plaintiffs have not presented any evidence suggesting that Ms. Garcia's decision to switch the locks and change the computer passwords was made in order to retaliate against the plaintiffs for exercising their rights under the FLSA, rather than because Ms. Garcia was extremely dissatisfied with both plaintiffs as stated in her February 4, 2015 emails and was looking to replace them after the bills were finished.

The fact that Ms. Garcia purportedly offered Ms. Perez' job to Ms. Cini does not change the Court's analysis because Ms. Garcia's email stated that she was "going to fire them both after the bills [we]re done." February 4, 2015 Email (DE# 180-1, 7/27/16).

20

**G.      Additionally Evidence Submitted by the Plaintiffs**

The Court granted leave to allow the plaintiffs to file the deposition transcripts of Paul Garcia and Nick Alonso. For the reasons stated below, the testimony of Paul Garcia and Nick Alonso do not change the Court's conclusion that the defendants are entitled to summary judgment on the plaintiffs' retaliation claims.

Paul Garcia is a forensic certified public accountant and serves as an expert in family law cases. In the years 2013 through 2015, between 50 to 100 clients of Mr. Garcia were attorneys. Of those attorneys, ninety percent were family law attorneys. Mr. Garcia testified that everyone in the family law bar knew about the instant lawsuit. According to Mr. Garcia, the family law attorneys who are his clients, "don't have an opinion as to Ms. Perez, they are shocked." Deposition of Paul Garcia (DE# 210-1 at 41, 12/19/16). None of the attorneys talk about Ms. Cini. Id. As previously noted in this Order, there is nothing in Mr. Garcia's deposition testimony that ties Defendant Anastasia Garcia to the alleged "blackballing" of the plaintiffs in the family law community. There is also no evidence that Defendant Anastasia Garcia provided negative employment references concerning the plaintiffs.

The plaintiffs also filed the deposition of Nick Alonso. Nick Alonso is a principal at a staffing company. Mr. Alonso testified that defendant Anastasia Garcia had contacted him in January 2016 or February 2016. See Deposition of Nick Alonso (DE# 210-2 at 5-7, 12/19/16). Ms. Garcia called Mr. Alonso and advised him that she was having problems with two of her assistants and wanted Mr. Alonso's help finding replacements. Id. at 6. Ms. Garcia did not use Mr. Alonso's staffing company because

of the cost. Id. She asked Mr. Alonso to refer someone to her without using the staffing company to avoid the cost. Ultimately, Mr. Alonso did not recommend anyone to Ms. Garcia.

Although the plaintiffs stopped working for Ms. Garcia in 2015, Mr. Alonso was adamant that the conversation with Ms. Garcia took place at the beginning of 2016, not 2015. See Deposition of Nick Alonso (DE# 210-2 at 13, 12/19/16). However, on cross-examination, Mr. Alonso testified that Ms. Garcia had contacted him while the plaintiffs were still employed. At best, Mr. Alonso's testimony shows that Ms. Garcia did not follow through with her intentions to contact Mr. Alonso about staffing until 2016 even though Ms. Garcia stated in her February 4, 2015 email: "My cousin's partner has an employment staffing agency. I am going to talk to him." See February 4, 2015 Email (DE# 180-1, 7/27/16). Mr. Alonso's deposition testimony does not create a genuine issue of material fact.

Based on the foregoing, it is

ORDERED AND ADJUDGED that the Defendants' Motion for Summary Judgment on the Retaliation Claims (DE# 179, 7/27/16) is **GRANTED** and the Plaintiffs' Motion for Summary Judgment (DE# 177, 7/27/16) is **DENIED**.

The Court will enter judgment for the defendants in a separate Order.

DONE AND ORDERED, in Chambers, at Miami, Florida, this **30th** day of December, 2016.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies to:
All counsel of record